**FILED**

JUL 27 2016 ƐW

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | **Under Seal** |
| | No. **16 CR 482** |
| v. | |
| | Violations: Title 18, United States Code, |
| SAEED VALADBAIGI, | Sections 371, 554(a), 1001, 1343, and |
| also known as "Saeed Valad" | 1349; Title 50, United States Code, |
| and "Saeed Baigi" | Sections 1705(a) and (c) |

**JUDGE DURKIN**

**COUNT ONE**

**MAGISTRATE JUDGE FINNEGAN**

The SPECIAL FEBRUARY 2016 GRAND JURY charges:

1.     At times material to this indictment:

       a.     Defendant SAEED VALADBAIGI, also known as "Saeed Valad" and "Saeed Baigi," was a resident of Iran and held an Iranian passport.

       b.     Super Alloys LLC was a company located in Dubai, United Arab Emirates.

       c.     Emirates Alloys LLC was a company located in Dubai, United Arab Emirates.

       d.     NBH Industries SDN BHD was a company located in Kuala Lumpur, Malaysia.

       e.     Georgia Petrochemical and Aviatech was a company located in Tblisi, Georgia.

       f.     Defendant VALADBAIGI was affiliated with and controlled the operations of Super Alloys, Emirates Alloys, NBH Industries, and Georgia Petrochemical and Aviatech.

g.     Industrial Metals and Commodities was a company located in Belgium whose managing director was Nicholas Kaiga.

h.     Company A, which maintained an office in the Northern District of Illinois, was a distributor of steel and aluminum products.

i.     Company B, which maintained an office in the Northern District of Illinois, was a distributor of titanium products.

j.     Company C, which maintained an office in Connecticut, was a distributor of acrylic sheets commonly used in the aerospace industry.

k.     Company D was a distributor of metal products located in Shenzen, China.

l.     Company E was a freight forwarding company located in Hong Kong, China.

2.     At times material to this indictment:

a.     The International Emergency Economic Powers Act, Title 50, United States Code, Sections 1701-1707, granted the President of the United States the authority to deal with unusual or extraordinary threats to the national security, foreign policy, or economy of the United States.

b.     Pursuant to Title 50, United States Code, Sections 1705(a) and (c) of the International Emergency Economic Powers Act, it was a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any regulation promulgated thereunder, including what were known as the Iranian Transactions

2

Regulations, the Iranian Transactions and Sanctions Regulations, and the Export Administration Regulations, as more fully described below.

### The Iranian Embargo

c.      On March 15, 1995, the President issued Executive Order 12957 finding that the actions and policies of the Government of Iran constituted an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. On that same date, the President declared a national emergency to deal with that threat.

d.      On May 6, 1995, the President issued Executive Order 12959 to take additional steps to deal with the unusual and extraordinary threat presented by Iran to the national security, foreign policy, and economy of the United States.

e.      Executive Order 12959 prohibited, among other things:

i.      the unauthorized exportation from the United States to Iran, or the financing of such exportation, of any goods, technology, or services (except publications and donations of articles intended to relieve human suffering); and

ii.      any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, or attempted to violate, any of the prohibitions contained in the Iranian Transactions Regulations, codified in part at 31 C.F.R. §§ 560.203 and 560.204 (effective to October 21, 2012).

f.      On February 5, 2012, the President issued Executive Order 13599, in order to take additional steps with respect to the national emergency

3

declared in Executive Order 12957. Pursuant to Executive Order 13599, effective October 21, 2012, the Iranian Transactions Regulations were replaced by the Iranian Trade and Sanctions Regulations, codified in part at 31 C.F.R. §§ 560.203 and 560.204.

g.      Section 560.204 of the Iranian Transactions Regulations and of the Iranian Transactions and Sanctions Regulations provided that:

> Except as otherwise authorized pursuant to this part, including § 560.511, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale or supply of any goods, technology, or services to a person in a third country undertaken with the knowledge that:
>
> (a)      Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or
>
> (b)      Such goods, technology, or services are intended for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

h.      Section 560.203 of the Iranian Transactions Regulations provided that:

> Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

i.      Effective October 22, 2012, Section 560.203 of the Iranian Transactions and Sanctions Regulations provided that:

4

Any transaction on or after the effective date that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited.

Any conspiracy formed to violate any of the prohibitions set forth in this part is prohibited.

      j.    In order to export, reexport, sell, or supply, directly or indirectly, from the United States, any goods, technology, or services to Iran or the Government of Iran, individuals and entities needed to apply for and obtain a license from the U.S. Department of Treasury, Office of Foreign Assets Control.

### *The Export Administration Regulations*

      k.    The Export Administration Act of 1979, Title 50 Appendix, United States Code, Sections 2401-2420, regulated the export of goods, technology, and software from the United States. Pursuant to the Export Administration Act, the U.S. Department of Commerce promulgated the Export Administration Regulations, Title 15, Code of Federal Regulations, Parts 730-774, which contained restrictions on the export of goods from the United States.

      l.    Although the Export Administration Act lapsed in August 2001, pursuant to his authority under the International Emergency Economic Powers Act, the President issued Executive Order 13222 on or about August 17, 2001. In that order, the President declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the Export Administration Act's expiration. Pursuant to the International Emergency Economic Powers Act, the President, and subsequent

Presidents, ordered that the Export Administration Regulations' provisions remain in full force and effect despite the expiration of the Export Administration Act.

m. In general, the Export Administration Regulations applied to goods, technology, and software that were "dual use" in nature, meaning that they had military and non-military applications. For various national security reasons, the Export Administration Regulations prohibited the export of certain goods and commodities to specific countries, absent permission from the U.S. Department of Commerce issued in the form of an export license. The U.S. Department of Commerce, Bureau of Industry and Security maintained the Commerce Control List, which consisted of general categories of goods that were controlled for export. Individual items within the Commerce Control List were identified by an Export Control Classification Number, which was known as an ECCN.

n. The Commerce Control List contained an entry designated as ECCN 1C202.a. This entry pertained to aluminum tubing and cylinders with an outside diameter of more than 75 millimeters (2.95 inches) capable of an ultimate tensile strength of 460 megapascals.

o. 7075 T6 aluminum tubing with an outside diameter of 4.125 inches and an ultimate tensile strength of 572 megapascals was on the Commerce Control List and assigned ECCN 1C202.a.

p. Goods classified ECCN 1C202.a, including 7075 Aluminum, were controlled for Nuclear Nonproliferation purposes.

q. An export from the United States to Malaysia of Nuclear Nonproliferation controlled materials, including 7075 Aluminum, required a license issued by the U.S. Department of Commerce, Bureau of Industry and Security. An export from the United States to Belgium of Nuclear Nonproliferation controlled materials did not require a license.

3. At no time material to this indictment did defendant VALADBAIGI, Nicholas Kaiga, Industrial Metals and Commodities, Companies A through F, Emirates Alloys, or Super Alloys apply for or obtain a license from the U.S. Department of the Treasury, Office of Foreign Assets Control, to export, reexport, sell, or supply, from the United States to Iran, any goods, technology, or services.

4. At no time material to this indictment did defendant VALADBAIGI, Nicholas Kaiga, Industrial Metals and Commodities, Company A, or NBH Industries apply for or obtain a license from the U.S. Department of Commerce, Bureau of Industry and Security, to export, from the United States to Malaysia or Iran, goods listed under ECCN 1c202.a, including 7075 Aluminum.

## OVERVIEW OF THE SCHEME

5. Beginning no later than in or about September 2007, and continuing until at least in or about October 2013, in the Northern District of Illinois, Eastern Division, and elsewhere,

SAEED VALADBAIGI,
also known as "Saeed Valad" and "Saeed Baigi,"

defendant herein, together with co-schemer Nicholas Kaiga and co-schemers known and unknown to the grand jury, knowingly devised, intended to devise, and

7

participated in a scheme to defraud and to obtain property from distributors of U.S.-origin goods by means of materially false and fraudulent pretenses and representations, and by concealment of material facts, which scheme is further described below.

6.     It was part of the scheme that defendant VALADBAIGI and his co-schemers, for the purpose of obtaining U.S.-origin goods with applications in the missile and aerospace industries, including aluminum, steel, and titanium alloys, polycarbonate sheets, and laminated cloth, for export and re-export to Iran, placed orders for such goods with distributors located in the Northern District of Illinois and elsewhere within the United States.

7.     It was further part of the scheme that defendant VALADBAIGI and his co-schemers arranged for distributors of U.S.-origin goods to export such goods to various companies controlled by defendant and his co-schemers, including Super Alloys, NBH Industries, Georgia Petrochemical, and Industrial Metals and Commodities, by falsely representing that such goods would remain in the countries where those companies were located. In reality, defendant intended to, attempted to, and did transship these goods to Iran, without the required license and in violation of U.S. law. In doing so, defendant fraudulently obtained and attempted to obtain goods that the U.S. distributors would not have otherwise sold and shipped but for defendant's false pretenses and representations, and his concealment of the ultimate destination of such goods.

***Company A***

8.     It was further part of the scheme that beginning in approximately September 2007, defendant VALADBAIGI placed several orders for U.S.-origin metal alloys for shipment to Super Alloys in the United Arab Emirates.

9.     It was further part of the scheme that in approximately September 2007, defendant VALADBAIGI placed an order for U.S.-origin 7075 Aluminum from Company A, in the Northern District of Illinois, for export to Super Alloys in the United Arab Emirates.

10.     It was further part of the scheme that defendant VALADBAIGI falsely represented to Company A that the 7075 Aluminum was to remain in the United Arab Emirates, when, in fact, he intended to transship the goods to Iran.

11.     It was further part of the scheme that, after defendant VALADBAIGI placed his order for the 7075 Aluminum but was unable to secure a license to export the aluminum to Super Alloys, in approximately November 2009, defendant directed Company A to ship his pending orders to Industrial Metals and Commodities in Belgium.

12.     It was further part of the scheme that, in approximately April 2010, defendant VALADBAIGI directed Company A to ship a pending order for 4130 Steel to Industrial Metals and Commodities in Belgium.

13.     It was further part of the scheme that defendant VALADBAIGI arranged for co-schemer Nicholas Kaiga to transship the 4130 Steel to NBH Industries in Malaysia, which Kaiga did approximately one month after the 4130 Steel arrived in Belgium.

9

14. It was further part of the scheme that, in approximately September 2010, defendant VALADBAIGI directed Company A to ship a pending order for 9310 Steel to Industrial Metals and Commodities in Belgium.

15. It was further part of the scheme that defendant VALADBAIGI arranged for co-schemer Nicholas Kaiga to transship the 9310 Steel to NBH Industries in Malaysia, which Kaiga did approximately three weeks after the 9310 Steel arrived in Belgium.

16. It was further part of the scheme that, in approximately July 2011, in an attempt to induce Company A to export the 7075 Aluminum without a license, defendant VALADBAIGI falsely represented to Company A that he had "sold" the 7075 Aluminum to Industrial Metals and Commodities in Belgium, and that the end user and ultimate consignee for the 7075 Aluminum were located in Belgium. In reality, defendant intended to transship the 7075 Aluminum, through Belgium, to NBH Industries in Malaysia and, ultimately, to a destination in Iran.

17. It was further part of the scheme that defendant VALADBAIGI arranged for co-schemer Nicholas Kaiga to transship the 7075 Aluminum from Belgium to NBH Industries in Malaysia, which Kaiga did approximately two months after the 7075 Aluminum arrived in Belgium.

**Company B**

18. It was further part of the scheme that in approximately March 2009, defendant VALADBAIGI placed an order for U.S.-origin titanium sheets from Company B, in Northbrook, Illinois, purportedly for export to Georgia Petrochemical and Aviatech in the country of Georgia.

10

19.     It was further part of the scheme that defendant VALADBAIGI falsely represented to Company B that the titanium sheets were to remain in Georgia, when, in fact, he intended to transship the goods to Iran.

20.     It was further part of the scheme that, in approximately May 2009, after the titanium sheets were exported from the United States to Georgia, defendant VALADBAIGI arranged for and caused the goods to be transshipped through Georgia to the United Arab Emirates.

21.     It was further part of the scheme that, in approximately May 2009, after the titanium sheets were transshipped from Georgia to the United Arab Emirates, defendant VALADBAIGI attempted but was unable to transship the goods from the United Arab Emirates to Iran.

22.     It was further part of the scheme that, in approximately May 2009, after defendant VALADBAIGI was unable transship the titanium sheets from the United Arab Emirates to Iran, defendant caused the goods to be shipped to NBH Industries in Malaysia for transshipment to Iran.

23.     It was further part of the scheme that, in approximately June 2009, after the titanium sheets arrived in Malaysia, defendant VALADBAIGI arranged for the titanium sheets to be turned over to a freight forwarder defendant frequently used to transship goods from Malaysia to Iran.

***Company C***

24.     It was further part of the scheme that, in approximately July 2012, defendant VALADBAIGI placed an order for U.S.-origin acrylic sheets from

11

Company C, in Stamford, Connecticut, without initially identifying a delivery location.

25.     It was further part of the scheme that, in approximately August 2012, after placing his order for acrylic sheets, defendant VALADBAIGI requested that Company C export the goods to a company called Metals Resources Industries in Belgium.

26.     It was further part of the scheme that, in approximately November 2012, defendant VALADBAIGI amended his order and requested that Company C export the acrylic sheets to Company D in China. In doing so, defendant falsely represented to Company C that the end user of the acrylic sheets was an aircraft company located in China.

27.     It was further part of the scheme that, in approximately December 2012, defendant VALADBAIGI again amended his order and requested that Company C export the acrylic sheets to Company E in Hong Kong. In doing so, defendant falsely represented to Company C that the end user of the acrylic sheets would be Company E in Hong Kong.

28.     It was further part of the scheme that, in approximately January 2013, contrary to his representations to Company C, defendant VALADBAIGI arranged for and attempted to cause the acrylic sheets to be transshipped to Iran.

29.     It was further part of the scheme that defendant VALADBAIGI concealed, misrepresented, and hid and caused to be concealed, misrepresented, and

hidden the existence and purpose of the scheme and the acts done in furtherance of the scheme.

30.     On or about July 31, 2011, in the Northern District of Illinois, Eastern Division, and elsewhere,

SAEED VALADBAIGI,
also known as "Saeed Valad" and "Saeed Baigi,"

defendant herein, for purpose of executing and attempting to execute the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate and foreign commerce certain writings, signs, and signals, namely, an email message regarding a shipment of 7075 Aluminum, which was sent from a server located outside of the United States to Company A in the Northern District of Illinois;

In violation of Title 18, United States Code, Sections 1343 and 1349.

## **COUNT TWO**

The SPECIAL FEBRUARY 2016 GRAND JURY further charges:

1.     Paragraphs 1 through 29 of Count One are incorporated here.

2.     On or about August 2, 2011, in the Northern District of Illinois, Eastern Division, and elsewhere,

SAEED VALADBAIGI,
also known as "Saeed Valad" and "Saeed Baigi,"

defendant herein, for the purpose of executing and attempting to execute the above-described scheme, knowingly caused to be transmitted in interstate and foreign commerce certain signals and sounds, namely, a telephone call routed between a location in the Northern District of Illinois and a location outside of Illinois;

In violation of Title 18, United States Code, Sections 1343 and 1349.

## **COUNT THREE**

The SPECIAL FEBRUARY 2016 GRAND JURY further charges:

1.      Paragraphs 1 through 29 of Count One are incorporated here.

2.      On or about December 13, 2012, in the Northern District of Illinois, Eastern Division, and elsewhere,

SAEED VALADBAIGI,
also known as "Saeed Valad" and "Saeed Baigi,"

defendant herein, for the purpose of executing and attempting to execute the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate and foreign commerce certain writings, signs, and signals, namely, an email message regarding a shipment of acrylic sheets, which was sent from a server located outside of the United States to Company C in Connecticut;

In violation of Title 18, United States Code, Sections 1343 and 1349.

## **COUNT FOUR**

The SPECIAL FEBRUARY 2016 GRAND JURY further charges:

1.     Paragraphs 1 through 3 of Count One are incorporated here.

2.     Beginning no later than on or about September 13, 2007, and continuing until at least in or about June 2012, in the Northern District of Illinois, Eastern Division, and elsewhere,

SAEED VALADBAIGI,
also known as "Saeed Valad" and "Saeed Baigi,"

defendant herein, willfully and knowingly attempted to violate, and attempted to cause a violation of, licenses, orders, regulations, and prohibitions issued under the International Emergency Economic Powers Act, Title 50, United States Code, Sections 1701 to 1707, and Title 31, Code of Federal Regulations, Part 560, namely, defendant attempted to export, sell, and supply, and attempted to cause to be exported, sold, and supplied, directly and indirectly, from the United States, goods, namely, 7075 Aluminum, to Iran, without first obtaining the required authorization from the U.S. Department of Treasury, Office of Foreign Assets Control;

In violation of Title 50, United States Code, Sections 1705(a) and (c), and Title 31, Code of Federal Regulations, Sections 560.203 and 560.204.

## COUNT FIVE

The SPECIAL FEBRUARY 2016 GRAND JURY further charges:

1.      Paragraphs 1, 2, and 4 of Count One are incorporated here.

2.      Beginning no later than on or about November 26, 2010, and continuing until at least in or about June 2012, in the Northern District of Illinois, Eastern Division, and elsewhere,

SAEED VALADBAIGI,
also known as "Saeed Valad" and "Saeed Baigi,"

defendant herein, willfully and knowingly attempted to violate, and attempted to cause a violation of, licenses, orders, regulations, and prohibitions issued under the International Emergency Economic Powers Act, Title 50, United States Code, Sections 1701 to 1707, and Title 15, Code of Federal Regulations, Part 738, namely, defendant attempted to export, and attempted to cause to be exported, from the United States, goods, namely, 7075 Aluminum, to Malaysia and Iran, without obtaining the required license from the U.S. Department of Commerce, Bureau of Industry and Security;

In violation of Title 50, United States Code, Sections 1705(a) and (c), and Title 15, Code of Federal Regulations, Part 738.

## COUNT SIX

The SPECIAL FEBRUARY 2016 GRAND JURY further charges:

1.     Paragraphs 1, 2, and 4 of Count One are incorporated here.

2.     Beginning no later than in or about November 2010, and continuing until at least in or about February 2012, in the Northern District of Illinois, Eastern Division, and elsewhere,

SAEED VALADBAIGI,
also known as "Saeed Valad" and "Saeed Baigi,"

defendant herein, knowingly conspired with Nicholas Kaiga, and with others known and unknown to the grand jury, to defraud the U.S. Department of Commerce and the United States government by interfering with and obstructing a lawful government function, namely, the enforcement of the laws and regulations prohibiting the export of 7075 Aluminum from the United States to Malaysia without a license, by deceit, craft, trickery, and dishonest means.

MANNER AND MEANS OF THE CONSPIRACY

3.     It was part of the conspiracy that defendant VALADBAIGI and coconspirator Nicholas Kaiga conspired to export 7075 Aluminum, from the United States to Malaysia, without a license issued by the U.S. Department of Commerce, Bureau of Industry and Security, by fraudulently using Kaiga's company, Industrial Metals and Commodities in Belgium, as the nominal purchaser and recipient of such aluminum for purposes of U.S. commerce and export laws and regulations.

4.     It was further part of the conspiracy that defendant VALADBAIGI and coconspirator Nicholas Kaiga arranged for Company A to prepare fraudulent

18

invoices, which, among other things: (i) falsely identified Industrial Metals and Commodities in Belgium as the purchaser and end user of the 7075 Aluminum; and (ii) fraudulently undervalued the true cost of the 7075 Aluminum.

5. It was further part of the conspiracy that defendant VALADBAIGI and coconspirator Nicholas Kaiga submitted and caused the submission of false documents and shipping information to the U.S. government regarding their export and attempted export of 7075 Aluminum from the United States, purportedly to Belgium.

6. It was further part of the conspiracy that defendant VALADBAIGI, coconspirator Nicholas Kaiga, and others communicated through various email accounts to conduct business in the Northern District of Illinois, elsewhere in the United States, and abroad.

OVERT ACTS

7. In furtherance of this conspiracy, and to accomplish its objectives, defendant VALADBAIGI performed and caused to be performed the following overt acts, in the Northern District of Illinois, and elsewhere, among others:

a. On or about July 31, 2011, in an email sent to Company A and coconspirator Nicholas Kaiga, defendant VALADBAIGI: (i) claimed to have sold to Industrial Metals and Commodities, in Belgium, the 7075 Aluminum that he had purchased from Company A; and (ii) directed Company A to create an invoice and shipping documents identifying Industrial Metals and Commodities as the 7075 Aluminum's purchaser, and undervaluing the actual cost of the 7075 Aluminum.

19

b.     On or about August 10, 2011, coconspirator Nicholas Kaiga sent Company A a completed U.S. Department of Commerce form (Form BIS-711), by email, in which: (i) Industrial Metals and Commodities was identified as the 7075 Aluminum's purchaser and ultimate consignee; and (ii) Kaiga represented that the 7075 Aluminum would be resold in Belgium for use in commercial helicopter parts.

c.     On or about October 21, 2011, defendant VALADBAIGI sent Company A an email in which he directed Company A to use only the invoice listing Industrial Metals and Commodities for shipping, not the invoice reflecting defendant as the purchaser.

d.     On or about November 21, 2011, defendant VALADBAIGI and conconspirator Nicholas Kaiga caused an employee of a freight forwarding company to file a fraudulent Shipper's Export Declaration with the U.S. government that falsely stated that the value of the 7075 Aluminum was $10,089 and that the 7075 Aluminum's country of ultimate destination was Belgium.

e.     On or about December 2, 2011, defendant VALADBAIGI and coconspirator Nicholas Kaiga caused Industrial Metals and Commodities to issue an invoice purporting to sell the 7075 Aluminum from Industrial Metals and Commodities to NBH Industries in Malaysia.

20

       f.     On or about February 7, 2012, defendant VALADBAIGI and coconspirator Nicholas Kaiga arranged for a freight forwarding company to ship what defendant and Kaiga believed to be 7075 Aluminum from Belgium to Malaysia.

      In violation of Title 18, United States Code, Section 371.

## COUNT SEVEN

The SPECIAL FEBRUARY 2016 GRAND JURY further charges:

1.      Paragraphs 1 through 4 of Count One are incorporated here.

2.      Beginning no later than on or about September 13, 2007, and continuing until at least in or about June 2012, in the Northern District of Illinois, Eastern Division, and elsewhere,

SAEED VALADBAIGI,
also known as "Saeed Valad" and "Saeed Baigi,"

defendant herein, fraudulently and knowingly, exported and sent, and attempted to export and send, from the United States merchandise, an article, and object, namely, 7075 Aluminum, contrary to the laws and regulations of the United States, namely, the International Emergency Economic Powers Act (Title 50, United States Code, Sections 1705(a) and (c)); the Iranian Transactions Regulations and the Iranian Transactions and Sanctions Regulations (Title 31, Code of Federal Regulations, Sections 560.203 and 560.204); and the Export Administration Regulations (Title 15, Code of Federal Regulations, Part 738);

All in violation of Title 18, United States Code, Section 554(a).

## **COUNT EIGHT**

The SPECIAL FEBRUARY 2016 GRAND JURY further charges:

1.    At times material to this indictment:

a.    Exporters, shippers, and freight forwarders were required to file certain forms and declarations concerning the export of goods from the United States, including a Shipper's Export Declaration form. In general, those forms and declarations were filed electronically through the Automated Export System, which was administered by the U.S. Department of Homeland Security, Customs and Border Protection. Exporters, shippers, and freight forwarders were required to file such forms and declarations for every export of goods and technology from the United States which had a value of $2,500 or more, or which required an export license.

b.    Information concerning the identity and location of the ultimate consignee, and the value of the export were an essential and material part of the Shipper's Export Declaration form. Such information was used by the U.S. Department of Homeland Security, Customs and Border Protection, and the U.S. Department of Commerce, Bureau of Industry and Security to, among other things, determine whether the goods could be exported without any specific authorization or license from the United States Government.

c.    Freight Forwarder A was a freight forwarding company located in Eden Prairie, Minnesota.

23

2.     On or about November 21, 2011, in the Northern District of Illinois, Eastern Division, and elsewhere,

SAEED VALADBAIGI,
also known as "Saeed Valad" and "Saeed Baigi,"

defendant herein, knowingly and willfully made, and caused to be made, materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the U.S. Department of Homeland Security, Customs and Border Protection, and the U.S. Department of Commerce, Bureau of Industry and Security, agencies within the executive branch of the Government of the United States, in that defendant stated and represented, and caused to be stated and represented, in a Shipper's Export Declaration generated by information submitted by Freight Forwarder A to the Automated Export System, that:

a.     The ultimate consignee for a shipment of 7075 T6 aluminum tubing was located in Belgium;

b.     The country of ultimate destination for the 7075 Aluminum was Belgium; and

c.     The value of the 7075 Aluminum was $10,089;

When in truth and fact, as defendant knew, these statements were false;

In violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## FORFEITURE ALLEGATION

The SPECIAL FEBRUARY 2016 GRAND JURY alleges:

1.      The allegations contained in Counts One through Three of this indictment are incorporated here for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.      As a result of his violations of Title 18, United States Code, Section 1343, as alleged in the foregoing indictment,

SAEED VALADBAIGI,
also known as "Saeed Valad" and "Saeed Baigi,"

defendant herein, shall forfeit to the United States: any and all right, title, and interest he may have in property, real and personal, which constitutes and is derived from proceeds traceable to the charged offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

3.      The interests of the defendant subject to forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), include but are not limited to:

a.      A shipment of alloy bars, valued at approximately $16,473, currently in the possession of the Department of Homeland Security and assigned Fine, Penalty, and Forfeiture case number 2008390100032501;

25

b.      A shipment of magnesium plates, valued at approximately $10,120, currently in the possession of the Department of Homeland Security and assigned Fine, Penalty, and Forfeiture case number 2008390100031301;

c.      A shipment of alloy ingots, valued at approximately $61,540, currently in the possession of the Department of Homeland Security and assigned Fine, Penalty, and Forfeiture case number 2009520100012401; and

d.      A shipment of aluminum sheets, valued at approximately $69,837, currently in the possession of the Department of Homeland Security and assigned Fine, Penalty, and Forfeiture case number 2008390100046001.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

_____

FOREPERSON

_____
UNITED STATES ATTORNEY

26